**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BEUGRE S. NEHAN*,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 646 |
| | ) | |
| TOOTSIE ROLL INDUSTRIES, INC., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Beugre S. Nehan, alleges that his employer, Tootsie Roll Industries, Inc. ("Tootsie Roll"), discriminated against him on the basis of his race, national origin, and disability, and retaliated against him for having engaged in protected conduct. Tootsie Roll now moves for summary judgment on all counts. For the following reasons, the motion is granted.

**I. Background**

**A. Nehan's Compliance with Local Rule 56.1**

As an initial matter, Tootsie Roll requests that the Court strike from the record an enumerated list of Nehan's responses to its Local Rule 56.1 Statement and certain entries in his Supplemental Statement of Undisputed Facts. Tootsie Roll complains that Nehan does not cite specific paragraphs of his affidavit in his Supplemental Statement and argues that the denials that are based solely on his opinions, speculation, and legal argument should be stricken. Local Rule 56.1(b)(3) requires the party opposing summary judgment, when disputing a fact, to include "specific references to the affidavits, parts of the records, and other supporting materials relied upon," and a separate and additional statement for "any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other

1

supporting materials relied upon." 56.1(b)(3)(B), (C). It is the usual practice of courts to disregard improperly supported denials and fact statements, as well as immaterial assertions. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006) (district court properly exercised its discretion to disregard a statement of material facts that failed to adequately cite the record and included irrelevant information, legal argument, and conjecture); *Ammons v. Aramak Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (district court did not abuse its discretion to strike additional facts not included in a separate statement); *Payne*, 337 F.3d at 773 (noting that evidence presented to defeat summary judgment must be based on personal knowledge and must set forth specific facts showing that there is a genuine issue for trial). The Court has followed these practices here. To the extent that Nehan fails to effectively dispute facts properly set forth and supported by Tootsie Roll, those facts are deemed admitted for the purposes of this motion. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003)). Finally, because a Rule 56.1(b)(3) response is not the place for a party to assert additional facts, *see Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 634–44 (7th Cir. 2008) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995)), such extraneous assertions in Nehan's response to Tootsie Roll's statement are disregarded here. The factual background is accordingly taken from the parties' Local Rule 56.1 Statements to the extent that they are material, properly supported, and do not violate the local rules.

### B. Nehan and Rush Affidavits

Tootsie Roll also requests that the Court strike from the record two affidavits submitted by Nehan, the first being his own. Tootsie Roll argues that Nehan's affidavit includes only his own speculative beliefs about matters on which he is not qualified to testify and that it conflicts

with his earlier deposition testimony. The Seventh Circuit "ha[s] been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995). Where deposition testimony and an affidavit conflict, the affidavit is to be disregarded "unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Id.* at 67-68; *see also United States v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars*, 730 F.3d 711, 718 (7th Cir. 2013) ("[W]e do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony."). Nehan makes clear in his deposition that he was permitted to use a forklift after June 4, 2010. *See, e.g.*, Dep. 268:23–269:1 (acknowledging use of forklift on July 23, 2010); Dep. 318:20–319:3 ("Q: Mr. Nehan, between June 4, 2010 and your termination, were you allowed to use the forklift in the performance of your duties? . . . A: Yes."). Likewise, Nehan clearly stated in his deposition that Ed Weber, a warehouse and distribution manager at Tootsie Roll, told him that he did not have to use a forklift when he came to work. In his affidavit, however, Nehan states that "[I]n my deposition I stated that Ed Weber told me on June 4, 2010, that 'you don't have to use the forklift when you come to work.' By using that phrasing I was stating—to my understanding—that Ed Weber told me that I cannot use the forklift when I come to work." Pl.'s Aff. ¶ 3, Dkt. 59-1. Nehan attempts to explain the inconsistency by adverting to the fact that English is his second language, asserting in his affidavit that "[s]ometimes when I express myself and communicate, my phrasing and choice of words is different than what I mean to say." That English is Nehan's second language, however, fails to account for the problem, for at least three reasons. First,

Nehan repeated his testimony that Weber told him he did not "have to" use the forklift several times throughout the deposition, *e.g.*, 19:17-19; 268:18-19, suggesting that his phrasing was not simply an isolated misstatement. Second, Nehan mischaracterizes the statement in his affidavit; he testified in his deposition that Weber told him that if he was told to go pick (*i.e.,* to pick cases of candy to be assembled on a pallet for shipping, *see infra* at 5), "you don't have to pick [with a] forklift," and in the context of picking a pallet, a task that requires the candy to be placed on the pallet by hand, the comment makes perfect sense. *See also* Nehan Dep. Ex. 14 (EEOC Complaint, describing Weber's statement as "it was not necessary for me to use the forklift every time I work overtime"). Most significant, Nehan's contention that he meant to say that Weber told him he could no longer use forklifts at all is contrary to his multiple acknowledgements during his deposition that he used a forklift after June 4, 2010—acknowledgments that cannot be explained away as the result of poor phrasing on Nehan's part. Accordingly, the portions of Nehan's affidavit and statements of fact that rely on his claim that Weber told him he could no longer use a forklift are stricken and disregarded here.

Tootsie Roll also argues that the affidavit of Nehan's former coworker, Hi-Lo Operator Byron Rush, should be stricken because no foundation exists for certain of his allegations, his allegations are conclusory, and some of his allegations are irrelevant. Federal Rule of Civil Procedure 56(c)(4) requires affidavits used to support or oppose a motion for summary judgment to "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." "Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts." *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (citation

omitted). In his affidavit, Rush claims that forklifts are available to workers on a first-come, first-served basis and that "[w]hoever arrives first is entitled to use the forklift." Pl.'s Ex. I, Dkt. 59-4. While Rush also works as a Hi-Lo Operator and so would have observed how forklifts are used at Tootsie Roll, he does not identify the foundation for his claim that the first worker is "entitled," as though by policy, to use a forklift. Tootsie Roll's motion to strike is therefore granted as to this portion of the affidavit. Rush's other assertions are irrelevant to the determinative issues here, therefore it is unnecessary to further consider this request to strike.

### C.  Factual Background

Tootsie Roll is a confectionary company that manufactures and distributes candy, including Tootsie Rolls, Junior Mints, Fluffy Stuff, and Dubble Bubble bubble gum. Nehan, an African American who immigrated to the United States from the Ivory Coast, was employed at Tootsie Roll's Chicago, Illinois, plant from June 18, 2002, to August 18, 2010 (though he was laid off for some portions of this tenure). Nehan was initially hired as a Laborer. Throughout his employment, he worked in different departments. At the time of his discharge, Nehan was working as a Hi-Lo Shipping and Receiving Operator in Tootsie Roll's shipping and receiving department, a position that Nehan asserts is interchangeably called a "forklift driver."

In his role as a Hi-Lo Shipping and Receiving Operator, Nehan moved products from one location to another, loaded trucks by forklift or by hand, and "picked" cases of candy to create pallets for shipping. Picking cases involves logging into a computer and selecting what the computer indicates should be included in the case. Tootsie Roll expects employees to use a motorized pallet jack, known as a "walkie," when picking cases. Employees stand on the walkies and maneuver them between pallets. Walkies are lower to the ground and smaller than forklifts.

If no walkies are available, employees may use forklifts. When using a forklift, employees climb in and out of a cab each time they pick a new box of candy; this action is not required with a walkie.[1] Certain tasks can be done with a forklift but not a walkie; a forklift can lift a pallet forty feet in the air, a walkie lifts it only two. Regardless of whether a forklift or walkie is used, each case of candy needs to be placed on the pallet by hand.

While employed at Tootsie Roll, Nehan was a member of the bargaining unit represented by the Local Union No. 1 Bakery, Confectionary, Tobacco Workers and Grain Millers International Union, AFL-CIO-CLC ("Union"). The terms and conditions of his employment were governed by a collective bargaining agreement ("CBA") between Tootsie Roll and the Union. As required by the CBA, decisions about promotions, transfers, and layoffs are governed by seniority and are determined on both a plant-wide and departmental basis. The CBA contains a nondiscrimination provision that provides "Neither the Employer nor the Union shall discriminate against any individual because of his or her race, color . . . national origin . . . disability . . . or any other legally protected status as defined by law." The CBA further provides

---

[1] Tootsie Roll asserts that "[e]mployees are less likely to get injured when using a walkie because—unlike the forklift—they are not required to climb in and out of a cab each time they pick a new box of candy." *See* DSOF ¶ 19, Dkt. 45. In his Response to Tootsie Roll's 56.1 Statement, Nehan appears to dispute this claim, stating "that employees are not required to climb in and out of a cab each time they pick a new box of candy when using the forklift." The deposition testimony Nehan cites to support this statement, however, suggests that the wording of his "admission" is mistaken and that he intended to admit the fact asserted, at least with regard to the climbing actions required when using the forklift. *See* Nehan Dep. 40, Ex. 1, Dkt. 46-1 (noting that when "using a forklift, you would have to climb in and out of a cab to get off and— each time you would need to pick up a new box of candy").

Tootsie Roll also asserts that employees are less likely to get injured while using a walkie, but the Court cannot credit this categorical assertion in light of Nehan's testimony that a person must bend more to use the walkie. It is reasonable to conclude that the relative likelihood of injury when using the walkie and forklift would depend on the circumstances and physical condition of a particular employee.

that Tootsie Roll and the Union "agree to abide by the [Americans with Disabilities Act ("ADA")] with regard to reasonable accommodations for disabled employees and furthermore agree to meet and confer regarding situations in which such decisions may create misunderstandings." Tootsie Roll provides its managers with training on equal employment opportunity laws; one such session was conducted eight months before Nehan filed his complaint.[2] Tootsie Roll's Overtime Policy does not include any provision requiring reasonable accommodation for employees with disabilities. Tootsie Roll also maintains a "Work Conduct in a Working Environment Policy," which prohibits employees from intimidating or threatening other employees.

Tootsie Roll's business is cyclical; it is typically busiest in advance of Halloween. Tootsie Roll sometimes has plant shut-downs where it operates with a skeletal staff to perform maintenance and other work on an as-needed basis. During the shut-downs, employees are subject to being laid off. Consistent with the seniority process, employees are laid off and called back from being laid off in order of seniority. Nehan acknowledged in his deposition that he was laid off less often as he gained seniority with the company.

Tootsie Roll employees are sometimes given the option to work overtime. As Edward Weber, who oversees shipping, receiving, and warehousing, describes the optional overtime process, the shipping and receiving department maintains a list of employees' phone numbers in seniority order. According to Weber, after an employee is called for overtime, he or she will not

---

[2] Nehan attempts to dispute this fact by citing page 55 of the deposition of Willie McCaa, a Tootsie Roll manager, but that particular page of the deposition is not included in any of the exhibits before the Court. Tootsie Roll's fact is therefore deemed admitted.

be called again until the department has called everyone on the list.[3] Tootsie Roll also sometimes

requires employees to work mandatory overtime. The Warehouse Shipping and Receiving

department sets forth specific expectations regarding mandatory overtime; the department will

schedule ten-hour days and Saturdays when needed, and repeated refusals to work this overtime

results in disciplinary action under the Plant Rules.

Tootsie Roll's Plant Work Rules set forth the disciplinary steps for rule infractions. For

example, insubordination typically results in suspension in the first instance and discharge in the

second. Tootsie Roll reserves the right to accelerate or decelerate the disciplinary steps based on

the nature of the conduct. These rules were posted in the plant and provided to Nehan.

Nehan has had multiple back injuries. In 2002, before he began working for Tootsie Roll,

he suffered a back injury while working for another employer, Harrah's Casino. Subsequently,

he had back surgery during a period in which he was laid off from Tootsie Roll. Nehan returned

to work at Tootsie Roll in 2004 and provided a work release form to the Director of Human

Resources. The form, which was dated June 17, 2004, and signed by Dr. Levin, indicated that

Nehan should "[a]void repetitive/continuous bending or twisting; neck/low back" and "[m]ay lift

and carry up to 30-40 lbs., between waist and shoulders." Pl.'s Ex. F, Dkt. 59-3. Nehan suffered

___

[3] Nehan generally denies that employees are given the option to work overtime but does not offer a citation to any supporting evidence on that point. Tootsie Roll's assertion is therefore deemed admitted. In the same response, Nehan also denies that *he in particular* is called for overtime in this manner; he claims to be skipped in the rotation. As to this latter assertion and the details Nehan includes to support his point, a Rule 56.1(b)(3) response "is not the place for purely argumentative denials" or, as the Court has already noted, additional facts. *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). This portion of his response is stricken, as are and similar portions of other responses that share the same flaws. In line with the Court's responsibility to make all reasonable inferences in the non-moving party's favor, it understands Weber's testimony on this particular point to describe only the general process regarding overtime work and does not take it to mean that Nehan in particular was actually called in this way.

additional back injuries while working for Tootsie Roll in 2004 and 2006. He does not, however, claim that he was "disabled" or required work restrictions during this period.

On June 10, 2009, Nehan was lifting something at work and felt pain in his back going down to his leg. James Onayemi, to whom he then reported, instructed him to go to the clinic to which Tootsie Roll sends employees for work-related injuries. The physician's report noted, "The effective date for this work capacity is June 10, 2009. Patient is to be [o]ff [w]ork the remainder of shift and then restricted work at start of next shift. Limit lifting to 10LB. Limit standing to 15 minutes per hour. Limit walking to 10 minutes per hour." Nehan Dep. Ex. 16, Dkt. 46-3. Nehan continued with followup care at the clinic and provided copies of the "Work Status Reports" issued by the clinic to the nurse at Tootsie Roll. The reports continued to restrict Nehan from standing, bending, and lifting.

Due to this injury and the resulting restrictions, Nehan did not return to work until July 13, 2009. He was then assigned to light duty in the production department on the third shift after informing Tootsie Roll about his medical restrictions. Typically, the least senior person or a person who is on light duty is assigned to the third shift, which runs from before midnight to the early morning hours. In the production department, Nehan reported to Willie McCaa, an African American born in the United States. One day, McCaa assigned Nehan to build boxes.[4] He also asked Nehan to transfer ten-ounce bags from a broken case to a good case, one at a time. Nehan

---

[4] The parties dispute whether this task involves bending. Nehan testified that the task required "a lot of bending," exceeding his restrictions. McCaa testified that he does not expect employees to bend when making boxes. Instead, boxes are stacked on top of one another in front of the employee. As the employee makes boxes and the pile goes down, the employee can request more boxes to keep the stack level. According to McCaa, Nehan was not required to get his own boxes. At this stage of the litigation, the Court credits Nehan's assertion that the task involved bending.

told McCaa that his back was hurting and that he could not bend. Claiming this assignment did not meet his medical restrictions, Nehan asked for his union steward, who told Nehan to tell McCaa to bring him a chair. The record does not reflect whether Nehan did so. Nehan unloaded two more pallets but then his back began hurting so badly that he called 911. The paramedics arrived, but did not take him to the hospital; the record does not reflect why. He went (apparently on his own) to the medical clinic to which Tootsie Roll generally referred injured employees, and then to the emergency room at Advocate Trinity Hospital. After this, Nehan remained off work until August 17, 2009. On October 15, 2009, Nehan's physician, Dr. Levin, cleared him to return to full duty. Dr. Levin's progress note returning him to work full duty does not indicate that Nehan had any work restrictions. Nehan asserts that he told Dr. Levin that he was a forklift operator, so the note should be understood as releasing him to work if he used a forklift.

Ed Weber, who is Caucasian and American, is the Warehouse Manager at Tootsie Roll and oversees the shipping, receiving and warehousing of Toosie Roll's products. John Grosse (Caucasian, American), James Onayemi (Black, Nigerian), and Jose Garcia (Hispanic, American) report to Weber. On April 18, 2010, Grosse assigned Nehan to unload a truck. Nehan testified that he told Grosse that he needed to use the forklift due to his back, but Grosse told him to give the forklift to another employee; Nehan did the work without the use of a forklift.

On June 4, 2010, Nehan was assigned to pick mixed pallets. He began his shift at noon, using a forklift. At 1:15 p.m., Grosse advised Nehan that he would have to give the folklift to another employee who would be starting later that afternoon. At 1:35 p.m., Grosse and Weber told Nehan again that they would need his forklift. Nehan responded, "okay." Nehan also testified that on that same day, a white American non-disabled employee named John Maka was

using a forklift to perform the same duties Nehan had been performing. Maka reported to Grosse and Weber, but was not directed to give up his forklift. That day, Maka was not on the same shift as Nehan, however. Nehan never told his supervisor, Onayemi, that he had back surgery and Onayemi was not aware of Nehan's alleged back impairment. After June 4, 2010, Nehan continued to use the forklift at work and no one at Tootsie Roll asked him to stop using it.

On June 24, 2010, the Union wrote to Pete Lebron, Tootsie Roll's Human Resources Manager, to ask that Nehan be allowed to use a forklift due to "his back injury not being of 100% of usage any longer." Lebron Dep. Ex. 20, Def.'s Ex. 4, Dkt. 46-6. Lebron responded that company records indicated that Nehan had been returned to full duty with no restrictions by his treating physician in October 2009. Lebron testified that Tootsie Roll did not hear from Nehan or the Union again about an alleged back injury.

Nehan claims that other employees who were also transferred to light duty positions in production were treated more favorably than he was, including Byron Rush (Black), Roger Jones (Black), "Rick" (Caucasian), and Lewinski (White).[5] He alleges that these employees' medical restrictions were accommodated while his were not, but he admits that he does not know the extent of their restrictions. Nehan also admits that Grosse likes other black people and did not treat Nehan differently because of his race, although he believes that Grosse treated everyone on the first shift better in terms of overtime. Grosse never said anything that led Nehan to believe that Grosse did not like him because of his race or accent, but Nehan believes that Grosse did not like him because he is from Africa.

---

[5] These racial designations are Nehan's.

Tootsie Roll's records reflect that Nehan received disciplinary reports for attendance and tardiness issues on multiple occasions between August 21, 2002, and September 13, 2005, and in subsequent years, as well. On July 30, 2008, Nehan was suspended for two days for tardiness. On August 8 that same year, he received a one-day in-house suspension for tardiness. On August 26, he received a verbal warning regarding attendance. On April 18, 2009, he received a five-day suspension for tardiness. That fall, on October 31, he received a written warning for absenteeism. On May 17, 2010, he received another in-house suspension for tardiness, this time for two days. On July 12, 2010, he received a written warning for absenteeism. Nehan's disciplinary write-ups were not limited to attendance and tardiness issues: On June 3, 2009, Nehan received a warning for "neglect/carelessness" and inattention to duties when he damaged a piece of equipment. The union grieved this warning and the company eventually rescinded it.

Nehan asserts that Tootsie Roll did not call him for overtime. On December 2, 2009, he arrived at work early to ask about the issue. He noticed that other employees with less seniority than him were already working. The defendant claims that Tootsie Roll had contacted him the previous day about coming in early to work overtime, but he did not answer; Tootsie Roll moved down the seniority list and Nehan's name did not come back into rotation. Nehan disputes this; he claims that no one from Tootsie Roll called him. On December 2, Nehan spoke with Grosse, Weber, and his union steward in the shipping office. He was upset and threw open the door so that it hit Grosse. Weber then drove Nehan to the Human Resources office to discuss the issue. Nehan jumped off the cart while it was moving and called Grosse and Weber racists. He apologized the next day. On December 7, 2009, Weber issued Nehan a written warning for "violation health/safety." Nehan believes Weber made a mistake and should have issued the

discipline to someone named "Leon"; he acknowledges that he does not believe that Weber issued the warning to him because of his race, but inconsistently maintains that Weber's mistake reflects an intent to retaliate against him for a grievance regarding overtime procedures.

Nehan was also disciplined for insubordination. On February 3, 2010, Supervisor Jose Garcia instructed Nehan to clean. Nehan questioned Garcia about other employees' assignments for the day, accused Garcia of harassing him, and left the floor to go to the office. As a result, Tootsie Roll suspended Nehan for two days for refusing his assignment and leaving his workspace. Nehan had not told Garcia about his disability.[6]

On February 22, 2010, Nehan was driving a forklift and Weber was driving behind him. Weber advised Nehan that he noticed sparks coming from the forklift. He asked Nehan to drive it again and there were no sparks. Nehan walked away toward the restroom. Weber walked in the same direction, toward the picking area to go home for the day. Nehan asked Weber to stop following him and accused Weber of harassing him. In the ensuing conversation, apparently in an argument over their relative expertise, Nehan told Weber that he had a Class A Commercial Driver's License and Weber replied that he had been in the Army. Nehan then asked Weber, "You gonna tell me how many people you killed? How many black people you killed?" Nehan Dep. 249, Dkt. 46-2. Weber responded that he did not want to talk about it and walked away toward the office. Weber reported to Human Resources that Nehan had stated to him, "get the fuck out of my face!" Nehan denies having made that comment. As a result of his conduct toward Weber, Nehan was suspended indefinitely. While on suspension, on February 25, Nehan

---

[6] Nehan attempts to dispute this by asserting that Garcia knew about his back surgery because he was standing next to Nehan when Nehan informed Grosse of his back surgery and back problems. The affidavit that he cites does not mention Garcia, therefore this attempt fails.

called Lebron and asked whether there was a meeting scheduled that day; Lebron replied that there was not. Nehan went to work anyway and was escorted out of the building. On March 1, Tootsie Roll sent him a final warning letter informing him that any further inappropriate behavior would result in discharge.

Notwithstanding the putative "final" warning letter, Nehan received additional disciplinary warnings. On March 18, 2010, Tootsie Roll issued Nehan a written warning for "health/safety violation" for not wearing safety glasses or a seat belt. On April 5, 2010, Tootsie Roll issued Nehan a second warning for the same issue. Nehan refused to sign these notices. On April 23 and 27, 2010, Tootsie Roll issued Nehan warnings for inattention to duty when he picked the wrong quantities for various orders. On May 17, 2010, Weber instructed Nehan to place a propane cylinder outside the building, but Nehan refused to move it. Tootsie Roll issued him a five-day suspension for insubordination. Nehan denies that his refusal was insubordination; he filed a grievance asserting that picking up the heavy cylinder tank would endanger his safety.

Nehan was also disciplined for refusing to work overtime. Nehan maintains that he repeatedly told his supervisors that due to his back pain, he needed to use the forklift to perform his job duties; he testified that he refused to work overtime generally because on June 4, 2010, Weber and Grosse "took [his] forklift and give to an employee." Nehan Dep. 269, Dkt. 46-2. On three dates in March 2010, Nehan refused to work overtime when instructed to do so by Onayemi because he believed that Tootsie Roll had not been calling him for optional overtime. As a result, Tootsie Roll cited him for insubordination. He again refused to work mandatory overtime on three more dates in the first half of July 2010; as a result, Tootsie Roll issued a

second written warning for insubordination. Nehan refused Onayemi's requests to work overtime four more times that July, telling Tootsie Roll that he was not working overtime because Weber and Grosse had taken his forklift on June 4 to give to another employee. Nehan Dep. 269, Dkt. 46-2. On July 23, 2010, Lebron wrote a letter to Nehan listing the seven dates on which he refused to work overtime as instructed and advising him that he had received warnings for failure to carry out the instructions of a supervisor under Plant Rule 19, which warrants suspension in the first instance and discharge in the second. The letter further stated, "If there are special circumstances you want the company to consider, you must let us know immediately." Nehan Dep. Ex. 46, Dkt. 46-4. Lebron testified that Nehan did not inform him of any special circumstances. Although Nehan maintains that he "repeatedly" told people at Tootsie Roll about his back issues and need to use a forklift when working overtime, he does not cite evidence of any specific response given in response to this particular letter.

Nehan again refused to work mandatory overtime on July 23, 2010, despite the previous warning letter and the additional fact that he was able to use a forklift during that particular shift. Lebron wrote him a letter on July 27, 2010, advising him that due to his repeated refusals to work overtime, he was suspended pending further investigation. Lebron advised Nehan that he had one last chance to provide an explanation for why he continually refused to work overtime. Nehan did not provide such documentation. His only explanation was that his forklift had been taken away on June 4, but Nehan does not cite evidence showing that he gave that explanation in response to Lebron's July 27 letter. Despite the warning in Lebron's letter, Nehan was instructed to return to work on August 2, 2010. Later that month, on August 17, Onayemi instructed him to work mandatory overtime. Nehan again refused. Tootsie Roll then terminated Nehan. Lebron,

Onayemi, Weber, and John Grodoski, the Director of Human Resources, participated in the decision to terminate him.

Nehan alleges that two other employees, "Elaine" and "Lewinski," refused to work mandatory overtime on one occasion. The mandatory overtime had been communicated over the loudspeaker. Nehan did not see a manager approach either employee and he does not know if they spoke to management about why they could not work overtime.

The union filed numerous grievances on Nehan's behalf between 2005 and 2010 for purported union contract violations and allegations of discrimination. On July 30, 2009, Nehan cross-filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race, national origin, and disability related to McCaa's alleged refusal to allow Nehan to perform jobs within his medical restrictions. On June 23, 2010, Nehan filed another charge of discrimination with the same agencies alleging national origin discrimination, disability discrimination, and retaliation related to the instance on June 4, 2010, during which Nehan alleges that Grosse and Weber took his forklift away. On September 22, 2010, Nehan filed a third charge of national origin discrimination, disability discrimination, and retaliation based on the termination of his employment at Tootsie Roll. The EEOC issued right to sue letters on November 3, 2010, June 20, 2011, and December 5, 2011.

### D. Procedural Background

Nehan filed this case in federal court on January 28, 2011. It was dismissed without prejudice to move for reinstatement and with leave to file an amended complaint on May 10, 2011. Nehan moved to reinstate the case on January 12, 2012. After the case was reopened (and

consolidated with a later-filed case that was before a different judge), Nehan filed a First Amended Complaint on March 2, 2012, alleging claims for disability discrimination in violation of the ADA (including failure to accommodate), race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, and retaliation for his complaints about the alleged discrimination. Now before the Court is Tootsie Roll's motion for summary judgment on all counts.

## II.    Discussion

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment is to determine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A court must grant a motion for summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Everett v. Cook Cnty.*, 655 F.3d 723, 726 (7th Cir. 2011) (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005)). In evaluating this motion, the Court construes all facts and draws all reasonable inferences in Nehan's favor as the nonmoving party. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). Even so, "[t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient; there must be evidence on which the jury could reasonably find for [him]." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252).

**A. Discrimination on the Basis of Race and National Origin**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Section 1981 prohibits racial discrimination and retaliation against employees when a contractual relationship exists between the employer and employee." *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 671 (7th Cir. 2011). A plaintiff may use either the direct or indirect method of proof to avoid summary judgment on a race or national origin discrimination claim under Title VII or § 1981. *See Chaib v. Indiana*, 744 F.3d 974, 981 (7th Cir. 2014); *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Davis*, 651 F.3d at 671 (noting that the "methods of proof and elements of the case are essentially identical" in Title VII and §1981 cases); *see also Atanus v. Perry*, 520 F.3d 662, 671–72 (7th Cir. 2008) (discussing the direct and indirect methods of proof). Nehan argues that he has made a showing sufficient to survive summary judgment under both the direct and indirect methods.

Under the direct method of proof, a plaintiff may introduce evidence that "points directly" to a discriminatory reason for adverse employment action. *Atanus*, 520 F.3d at 671–72. This showing can be made via "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)). Examples of circumstantial evidence that might bear an inference of intentional discrimination are suspicious timing, ambiguous statements, comments directed at employees in the protected group, and examples of similarly

situated employees outside the protected class who received better treatment. *See Atanus*, 520

F.3d at 672 (citing *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007)).

Nehan argues that Tootsie Roll's "constant refusal to recognize his medical restrictions, even after he presented countless medical documentation [sic] supporting his medical restrictions" is circumstantial evidence that is sufficient to support an inference of discriminatory intent based on race and national origin. But how does documentation regarding Nehan's treatment for back injuries bear on the question of whether Tootsie Roll intentionally discriminated against Nehan based on his race or national origin? It doesn't, which explains why Nehan's brief offers no explanation whatsoever for this untenable contention. The evidence Nehan cites consists of one paragraph of his affidavit and two batches of his medical records, work status reports, and correspondence regarding his medical treatment and physical status. No portion of this evidence relates to Nehan's race or national origin. In the context of a discrimination claim tried under the direct method, "the assembled evidence must point 'directly to a discriminatory reason for the employer's action' for [a plaintiff's] claim to survive summary judgment." *Davis*, 651 F.3d at 672. Nehan's evidence falls far short of this mark.

Under the indirect method of proof, Nehan must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class; (2) his job performance met Tootsie Roll's legitimate expectations; (3) he suffered an adverse employment action; and (4) Tootsie Roll treated similarly situated individuals outside of the relevant protected classes more favorably. *Huang v. Cont'l Cas. Co.*, No. 12-1300, --- F.3d ---, 2014 WL 2619689, at *2 (7th Cir. June 13, 2014); *Donahoe*, 667 F.3d at 845 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). If Nehan can establish all four elements, a rebuttable inference of

discrimination arises, and the burden shifts to Tootsie Roll to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If Tootsie Roll meets this burden, the burden shifts back to Nehan to prove that the proffered reason is pretext, allowing an inference of discrimination. *Id.* If, however, Nehan fails to establish any of the four elements of a *prima facie* case, he fails. If a plaintiff cannot establish a *prima facie* case, an employer is generally not subjected to the pretext inquiry. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002).

Tootsie Roll does not dispute that Nehan can establish the first and third elements, as he is a member of protected classes and was terminated from his position at Tootsie Roll. As to the second element, however, the uncontradicted evidence in the record shows that Nehan was not meeting Tootsie Roll's legitimate expectations. Whether Nehan met Tootsie Roll's legitimate expectations is measured at the time of his discharge. *Jones v. Provena St. Joseph Med. Ctr.*, 234 F.3d 1273 (7th Cir. 2000). Courts do not "sit as a super-personnel department and will not second-guess an employer's policies that are facially legitimate." *Id.* (citing *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999)). Tootsie Roll's policies and Nehan's disciplinary records are relevant here. *See, e.g.*, *Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 768 (7th Cir. 2008) (record of discipline showed that employee was not meeting employer's expectations); *Contreras v. Suncast Corp.*, 237 F.3d 756, 760–61 (7th Cir. 2001) (repeated citations for operating a forklift in an unsafe manner, violating workplace attendance policies, and insubordination showed employee was not meeting employer's legitimate expectations).

Nehan was the subject of more than twenty disciplinary actions, including citations for tardiness, inattention, and insubordination. Even setting aside the disciplinary citations that relate

to Nehan's failure to work overtime when directed, for which Tootsie Roll says he was ultimately terminated and which he contests are not "legitimate," Nehan received multiple other citations just in the year he was discharged, as well as more in prior years. In February 2010, he was suspended indefinitely following a dispute with Weber and given a final warning letter. In March, he was written up for safety violations. In April, he received warnings for inattention after picking the wrong quantities for various orders. He received an in-house suspension for two days in May for tardiness—and this was not the first in-house suspension he had served during his employment. He received a written warning for absenteeism that July. This is only a partial list. Tootsie Roll's rules state that far fewer citations can be grounds for discharge, so it is plain that these myriad violations suffice to establish that he was not meeting Tootsie Roll's legitimate expectations concerning its employees' conduct—and Nehan offers no affirmative argument that he was meeting Tootsie Roll's expectations despite his disciplinary record.

Nehan argues instead that Tootsie Roll's stated reason for terminating him—his refusal to work overtime—was not "legitimate." Resp. 7, Dkt. 54. Here he puts the cart before the horse; in order to get to whether Tootsie Roll's stated reason for terminating him was pretextual, Nehan must make out each element of a *prima facie* case. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (remarking that "merger of the legitimate expectations requirement with the pretext analysis is acceptable in limited circumstances," but noting that "the obligation to establish a *prima facie* case should not be disregarded as a matter of course"). Nehan argues that his other disciplinary citations have nothing to do with the purported reason for his termination, but fails to address the relevance of what they do show, namely his failure to meet his employer's legitimate expectations, a required element of proving his claim under the indirect

method of proof. Absent a showing (or even argument) that despite this record, he was meeting their expectations, he fails on this element. This prevents his claim from surviving this motion.

In any event, Nehan's argument that his termination for refusing to work overtime was illegitimate goes nowhere. There is no dispute that Nehan did, in fact, refuse to work overtime; he repeatedly acknowledged during his deposition that he refused to work overtime after the June 4, 2010, incident in which Weber and Grosse reassigned his forklift to another employee. His argument about the illegitimacy of his termination relates instead to his belief that the company failed to accommodate his need to use a forklift in order to carry out his duties. For the reasons explained at the outset of this opinion, *supra* at 3, Nehan's admissions in his deposition testimony that he was able to use a forklift doom this argument (predicated as it is on his contrary affidavit claim that Weber told him he could no longer use a forklift), but even putting that issue to the side, the question of whether it was "legitimate" to terminate Nehan for refusing overtime when he needed some physical accommodation is one that bears on Nehan's ADA claim, not his claim of racial and national origin discrimination. There is simply no basis to infer such discrimination from the fact (assuming, *arguendo*, it is true) that a failure to accommodate a physical disability is evidence of racial or national origin animus.

### B. Discrimination on the Basis of Disability

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). Nehan argues that Tootsie Roll discriminated against him when it discharged him because he was disabled and failed to accommodate his disability by allowing him to use a forklift. The core of Nehan's discrimination claims relate back to his displeasure about his forklift having been assigned to another employee on June 4,

2010. Mostly on the basis of this one incident, Nehan refused to work mandatory overtime and declined to engage in a constructive conversation with his employer regarding what he believed to be his equipment needs. However adamant he is regarding the benefit of using a forklift for someone with his history of back issues, the record on summary judgment does not support his discrimination claims surviving.

To establish a disability discrimination claim, Nehan must show that: (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) he has suffered from an adverse employment decision because of his disability. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). Tootsie Roll first contends that Nehan cannot prove that he is disabled under the ADA. A "qualified individual with a disability" is someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA specifies three ways that one can establish a "disability": "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[7] 42 U.S.C. § 12102(1)4; *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 606 (7th Cir. 2012).

Nehan argues that his back condition rendered him a qualified individual with a disability. The undisputed facts show that he was treated for back impairments multiple times, including in 2002, 2004, 2006, and 2009. He asserts that this physical impairment substantially limits one or more major life activities, which the ADA defines to include "performing manual

---

[7] The ADA was amended as of January 1, 2009; the amended version, which changed the "regarded as" standard, applies to the actions in this case that occurred after that date.

tasks, . . . walking, standing, lifting, bending, . . . and working." 42 U.S.C. § 12102(2)(A). When determining whether a disability "substantially limits" a person from performing such an activity under the ADA's first definition of disability, courts consider "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment"; generally, "short-term, temporary restrictions, with little or no long-term impact, are not substantially limiting and do not render a person disabled for purposes of the ADA." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 554 (7th Cir. 2011) (citations omitted).

The parties agree that Nehan was restricted in the activities of standing, lifting, and bending from June 10, 2009, until at least the date on which Dr. Levin released him to work full duty, October 15, 2009. Tootsie Roll argues that October 15, 2009, is therefore the date on which Nehan's limitations ended. Nehan argues that his restrictions did not in fact end on that date. He offers the report that Dr. Levin completed for the IDHR on June 1, 2010, which states that his condition could recur and that he had degenerative changes in his spine. This document also states, however, that Nehan's condition was of "temporary or brief duration" and would not result in long term effects. Pl.'s Ex. F, Dkt. 59-3. While Dr. Levin noted the possibility of recurrence, in response to the question "[W]hen did the symptoms cease?," he clearly wrote, "October 15, 2009," explaining that "symptoms have ceased—however patient still has degenerative changes in his lumbar spine." Pl.'s Ex. F, Dkt. 59-3. The report therefore actually supports Tootsie Roll's position. It distinguishes between his symptoms and both the hypothetical risk of recurrence and underlying unsymptomatic changes to Nehan's spine. It does not establish that the symptoms did in fact recur or that Nehan was, despite the cessation of his

symptoms, still limited. Nehan also argues that Dr. Levin's original work release is "insignificant" because it incorporated the understanding that Nehan used a forklift at work. But that does not establish that his condition in fact recurred and in any event proves too much: from the doctor's perspective, Nehan injured his back at work doing something and whatever it was, he felt that there was no need to impose any restrictions to prevent a recurrence. Finally, Nehan's affidavit, in which he claims "constant back pain" following his 2003 surgery, is too conclusory to establish substantial limitations, particularly in light of his track record of working in the years following 2003. *See* Nehan Aff. ¶ 7, Pl.'s Ex. C. No physician ever imposed anything other than short-term restrictions on Nehan's working conditions and, notably in this regard, there is no evidence in the record that Nehan ever sought any further treatment for his back after he was released to full duty by Dr. Levin in October 2009.

Nehan additionally argues, inconsistently, that Tootsie Roll regarded him as disabled. Since the Amendments to the ADA took effect in 2009, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Steffen v. Donahoe*, 680 F.3d 738, 744 (7th Cir. 2012) (quoting 42 U.S.C. § 12102). The point of this ground of liability under the statute is to prevent an employer from discriminating based on a disability that does not exist—but Nehan's position is that he was in fact disabled and that Tootsie Roll refused to accommodate him, not that Tootsie Roll inappropriately concluded that he could not perform his job due to a disability. "The amendments to the ADA clarified that employers needn't provide reasonable accommodation to

a 'regarded as' disabled individual." *Majors*, 714 F.3d at 539 n.4 (citing 42 U.S.C. § 12201(h)). Nehan's failure to accommodate claim would accordingly fail under a "regarded as" theory.

In any event, it is plain that Tootsie Roll did not regard Nehan as having any impairment. Tootsie Roll again cites Dr. Levin's release returning him to work full duty as of October 15, 2009. Nehan responds generally that he "repeatedly informed" Tootsie Roll of his impairment, but describes only one specific instance: Nehan testified that he complained to McCaa of pain in 2009 and filed a grievance against him for not allowing Nehan to take medication. McCaa Dep. 22, 42, 64; Nehan Dep. 73-75; Grievance No. 8460, Pl.'s Ex. H. But this evidence pertains to the period in which Nehan was temporarily working on "light duty." It does not suggest that Tootsie Roll would have had a basis for regarding Nehan as being limited outside that time period. Nehan's very general claim that "Tootsie Roll managers, supervisors, and HR were well aware of Nehan's disability" is similarly insufficient to help him here. Resp. 19 (citing Nehan Dep. 73-75, 107, 267-273; Nehan Aff. ¶¶ 3-4, 7, 12, 14, 35; Pl.'s Exs. F & G). Most of the evidence that Nehan cites for this proposition is irrelevant or pertains to the period before Nehan was returned to work full duty. Nehan's June 4, 2010, statement to Grosse, "I can't work 10 to 12 hours without no forklift," Nehan Dep. 107, is not enough to establish a dispute of fact. The statement contains no specific information about physical ailments that could have led Grosse to perceive him as disabled.

Even if Nehan could establish that he is "disabled" under the meaning of the ADA, he has not identified evidence to support a finding that he suffered an adverse employment decision because of his disability. Nehan may again use the direct or indirect method to prove this claim. *Bunn v. Khoury Enterprises, Inc.*, No. 13-2292, --- F.3d ---, 2014 WL 2198557, at *5 (7th Cir.

May 28, 2014). In his five-sentence argument on this element, Nehan does not carefully follow the approach of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973), so the Court considers his claim under the direct method of proof. *See Morgan v. SVT LLC*, 724 F.3d 990, 997 (7th Cir. 2013) (advising litigants and courts to default to the more straightforward "direct" method where a plaintiff has not carefully followed the indirect method); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013) (favoring the "simple analysis of whether a reasonable jury could infer prohibited discrimination"). To survive summary judgment, Nehan must identify proof sufficient to support a finding that he was terminated because of his disability. *Bunn*, 2014 WL 2198557, at *5. This can be proven by direct or circumstantial evidence. The former is rare; most plaintiffs "rely on circumstantial evidence, which might include: '(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.'" *Id.* at *5–6 (quoting *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011)).

Nehan's argument boils down to one theory: terminating him for refusing to work overtime is equivalent to terminating him because he is disabled. Here, his theory of the disability discrimination claim is that Tootsie Roll offers a pretextual reason for firing him. *See* Resp. 13–15. Pretext "means a lie, specifically a phony reason for some action." *Martino v. W. & S. Fin. Grp.*, 715 F.3d 195, 202 (7th Cir. 2013). As evidence of pretext, Nehan offers evidence relating to his interactions with McCaa in 2009. But these events occurred long before Nehan's termination and did not involve any of the decisionmakers who played a role in the termination

decision, so do not suggest pretext. The record otherwise shows that Nehan did in fact refuse—repeatedly—to work overtime in violation of Tootsie Roll's rules. His disability discrimination claim pertaining to his discharge therefore cannot survive this motion.

Nehan also asserts a failure to accommodate claim based on Tootsie Roll's alleged failure to provide him with a forklift. Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer can demonstrate that the accommodation would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). As to this claim, Nehan must demonstrate that: (1) he is a qualified individual with a disability; (2) his employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability. *Bunn*, 2014 WL 2198557, at *4 (citing *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). "An employer need only provide a qualified individual with a 'reasonable accommodation, not the accommodation [the employee] would prefer.'" *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012).

As discussed above, Nehan has failed to establish that he is a qualified individual with a disability, so Tootsie Roll had no duty to accommodate his back problems. But even had he established a disability, his argument that Tootsie Roll failed to reasonably accommodate his disability would fall short. "An employee begins the accommodation process by notifying her employer of her disability; 'at that point, an employer's liability is triggered for failure to provide accommodations.'" *Spurling*, 739 F.3d at 1061 (citing *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998)). After an employee has disclosed that he has a disability, the ADA requires an employer to "engage with the employee in an 'interactive process' to determine the

appropriate accommodation under the circumstances." *Id.* (quoting *Sears, Roebuck & Co.*, 417 at 805). Importantly here, the interactive process is iterative and involves action on the employee's part as well as the employer's. "[A]n employee who fails to uphold [his] end of the bargain—for example, by not 'clarifying the extent of [his] medical restrictions'—cannot impose liability on the employer for its failure to provide a reasonable accommodation." *Hoppe*, 692 F.3d at 840 (quoting *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998)).

Tootsie Roll argues that Nehan did not notify it of the nature and extent of his disability or the accommodation he needed. Nehan offers several types of evidence in response, most of it woefully inadequate to establish a dispute. The medical records he offers could not have alerted Tootsie Roll to ongoing medical restrictions in the relevant period. Most of them pertain to previous injuries and actually suggest that by placing him on "light duty," Tootsie Roll accommodated Nehan's restrictions so far as they knew about them. Nehan also cites Dr. Levin's work release form, but as has already been discussed, this document undermines his claim because it affirmatively put Tootsie Roll on notice that he could return to work full duty on October 15, 2009. Nehan also offers grievances filed on his behalf, but these lack information that would have put Tootsie Roll on notice of his limitations or needs. Pl.'s Ex. H (Grievances Nos. 7995, 8386, 8460, and 8605). Additionally, the purpose of these was to address the issues described in each grievance, not to clarify the extent or duration of any medical restrictions. Finally, Dr. Levin's IDHR report went to the state administrative agency, not to Tootsie Roll. It therefore cannot be cited for the proposition that Nehan put the latter on notice.

The best evidence that Nehan offers is his union steward's June 24, 2010, request for him to be able to use a forklift. Sanchez Letter, Pl.'s Ex. C (asking Pete Lebron, Tootsie Roll's

Human Resources Manager, that Nehan be allowed to use a forklift due to "his back injury not being of 100% of usage any longer"); Lebron Dep. Ex. 20, Def.'s Ex. 4, Dkt. 46-6. Lebron testified that he responded with a letter that stated that company records indicated that Nehan was returned to full duty with no restrictions by his treating physician in October 2009. Lebron testified that Tootsie Roll did not hear from Nehan or the Union again about an alleged back injury in response. Nehan attempts to deny that the Union received Lebron's letter, but does not cite any evidence to supports this assertion. *See* DSOF ¶ 34. It appears that instead of engaging in the interactive process and clarifying his medical condition as it stood in 2010, Nehan resorted to a self-help strategy of refusing to work overtime in apparent retaliation for what he perceived as a slight when Grosse and Weber made him give up his forklift on June 4, 2010. Without a reason to conclude that Nehan cooperated in good faith in the process required under the ADA, this Court must grant summary judgment to Tootsie Roll on the failure to accommodate claim.

### C. Retaliation

Neham also claims that he was retaliated against for engaging in protected activity. Title VII bars discrimination against an employee because the employee "oppose[s] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). The ADA similarly prohibits an employer from retaliating against an employee who asserts his rights under the ADA, regardless of whether the initial discrimination claims are meritless. 42 U.S.C. § 12203(a) ("Prohibition against retaliation and coercion"); *Povey*, 697 F.3d at 624 (citing *Dickerson*, 657 F.3d at 602). Retaliation claims may also proceed under direct and indirect methods of proof. *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (citing *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 784–85 (7th Cir. 2007)). Under the direct method, retaliation claims

must be proved according to the principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred absent the alleged wrongful actions of the employer. *See Chaib*, 2014 WL 685274, at *9 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013)). The indirect method involves burden shifting that "mirrors that for discrimination."[8] *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 983 (7th Cir. 2014) (quoting *Davis v. ConWay Transp. Cent. Express, Inc.*, 368 F.3d 776, 788 (7th Cir. 2004)).

There is no dispute that Nehan engaged in statutorily protected activity when he filed charges with the IDHR and EEOC and that his discipline and termination were adverse employment actions. Tootsie Roll argues, however, that Nehan cannot establish a genuine dispute on the last element. Nehan argues that the timing of his termination in August 2010, in relation to his charges of discrimination, filed on July 30, 2009, and June 23, 2010, suggests discrimination. But the fact that Tootsie Roll did not terminate Nehan for more than a year after his 2009 charge makes it unreasonable to conclude that he was terminated because of that charge. *See, e.g.*, *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (finding that "extended time gaps alone militate against allowing an inference of causation based on suspicious timing"); *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (finding that a two-month gap between plaintiff's complaint and termination was "not strongly suggestive of retaliation"); *McGuire v. City of Springfield, Ill.*, 280 F.3d 794, 796 (7th Cir. 2002) (noting that a long gap in time "undercuts an inference of causation"). Moreover, Nehan's work performance during the year 2010 was marked by frequent, repeated disciplinary warnings. As

---

[8] As already noted, Nehan's case fails under the indirect method due to his inability to establish that he was meeting Tootsie Roll's legitimate expectations. The Court therefore proceeds under the direct method.

Tootsie Roll points out, this distinguishes Nehan's case from the authority he cites. *See Phelan v. Cook Cnty.*, 463 F.3d 773, 788 (7th Cir. 2006) (noting that "Phelan introduced evidence that her termination was inconsistent with her satisfactory performance of her job shortly before termination"). As the Seventh Circuit has held, timing alone does not often create a fact issue, *see, e.g.*, *Donahoe*, 667 F.3d at 860, and that is particularly true where, as here, a plaintiff had such a negative record of performance at work. This final claim therefore cannot survive summary judgment.

\*　　\*　　\*

For these reasons, Tootsie Roll's motion for summary judgment is granted.

Date: July 23, 2014

_____
John J. Tharp, Jr.
United States District Judge